**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

DENISE APONTE o/b/o MR,

        **Plaintiff,**

  - against -

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        **Defendant.**

-------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

**OPINION AND ORDER**

**08 Civ. 5885 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/9/09

## I.   INTRODUCTION

On February 10, 2005, Denise Aponte filed an application for

Supplemental Security Income ("SSI") benefits on behalf of her minor daughter,

MR.[1]  Aponte claims that MR is disabled due to a learning disability and

behavioral problems.[2]  MR's application was denied on initial review.[3]  Aponte

then requested a hearing which was held before an Administrative Law Judge

---

[1]  *See* Transcript of the Administrative Record ("Tr.") filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g) at 15.

[2]  *See id.* at 55.

[3]  *See id.* at 49-52.

("ALJ") on January 10, 2007.[4]  Plaintiff was not represented by counsel at this hearing or at any other time.  Following the hearing, the ALJ considered MR's claim *de novo* and, on July 27, 2007, issued a decision finding that MR was not disabled.[5]

In his decision, the ALJ found that MR's impairments were severe and included a learning disability and attention deficit hyperactive disorder ("ADHD").[6]  The ALJ concluded, however, that none of MR's impairments met or medically equaled the criteria contained in the Commissioner's Listing of Impairments found at 20 C.F.R. Part 404, subpt. P, Appendix 1 (the "Listings").[7] The ALJ also found that MR's impairments did not functionally equal any impairment contained in the Listings after considering the relevant six domains of functioning.[8]  Specifically, the ALJ found that MR had less than marked limitations in the domains of: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; and (4) caring for

---

[4]     *See id.* at 46.

[5]     *See id.* at 15-26.

[6]     *See id.* at 18.

[7]     *See id.*

[8]     *See id.* at 18-26 (citing 20 C.F.R. § 416.926a(g)-(l).

2

oneself.[9]  The ALJ found no limitations in the domains of: (5) health and physical well-being; and (6) moving about and manipulating objects.[10]  Plaintiff requested review of the ALJ's decision.[11]  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 17, 2008.[12]  The instant action followed shortly thereafter.

## II.   BACKGROUND

### A.   Hearing Evidence

MR was born in May 1999.[13]  At the time of the administrative hearing, MR was seven years old and attended special education classes in the second grade.[14]  Plaintiff stated that MR had been taking the medication Concerta for the previous eight months.[15]  When MR first began taking Concerta, plaintiff stated that her focus had improved but more recently MR was "very, very hyper."[16]

---

[9]   *See id.*

[10]   *See id.*

[11]   *See id.* at 10-11.

[12]   *See id.* at 5-7.

[13]   *See id.* at 60, 202.

[14]   *See id.* at 202.

[15]   *See id.*

[16]   *Id.*

Plaintiff indicated that MR had not used any medications prior to taking Concerta.[17]

In terms of education, plaintiff stated that MR was far behind her peers academically.[18] She further testified that MR's ability to spell was very limited, that her "math is pretty good," and that her speech and language was "good."[19] MR lived with plaintiff and a younger brother; MR had older sisters who did not live at home.[20] Plaintiff stated that MR was "always beating up" her younger brother.[21] She also reported that MR had been seeing a therapist weekly for the previous eight months.[22] Plaintiff stated that MR had no other medical problems and that her health was generally good.[23]

## B.    Medical and Educational Evidence

On February 7, 2005, MR's kindergarten teacher, Caroline Maguire,

---

[17]    *See id.* at 204.

[18]    *See id.* at 203-04.

[19]    *Id.* at 204.

[20]    *See id.* at 204-05.

[21]    *Id.* at 205.

[22]    *See id.*

[23]    *See id.* at 206.

4

wrote a letter describing MR's poor performance in recognizing letters and
sounds, and her inappropriate behavior.[24]  Maguire believed that MR's lack of
progress in identifying sounds, letters and numbers was due to her behavior
problems and lack of attention.[25]   She noted that while in school, MR was
unfocused, had difficulty concentrating, and needed to be constantly reminded of
classroom rules.[26]  She further noted that MR made up "obscene stories" and lied
to get what she wants.[27]

Maguire also completed a Teacher Questionnaire, sent to her by the
Social Security Administration, which asked her to assess MR's performance in a
number of various activities.[28]  Maguire initially noted that MR was being
instructed at her actual grade level (kindergarten).[29]  In terms of acquiring and
using information, Maguire opined that out of the ten activities listed, MR had
slight problems in three activities, obvious problems in three activities, and serious

---

[24]  *See id.* at 96.

[25]  *See id.*

[26]  *See id.*

[27]  *Id.*

[28]  *See id.* at 101-06.

[29]  *See id.* at 100.

problems in four activities.[30]  For the thirteen activities listed under attending and

completing tasks, Maguire opined that MR had obvious problems in six separate

activities, and serious and very serious problems in seven other activities.[31]

Maguire opined that in the thirteen activities listed under interacting and relating

with others, MR had slight problems in nine activities, and serious problems in

four activities.[32] Maguire reported that MR had no problems with speech, activities

involving moving about and manipulating objects, and caring for herself.[33]

Maguire noted that MR was not taking any medication at this time.[34]

On March 20, 2005, MR was examined by Dr. Alan Dubro, a

consulting psychologist.[35]  Plaintiff informed Dr. Dubro that MR had not received

any previous psychiatric treatment and was not taking any medications.[36]   Plaintiff

also informed Dr. Dubro that MR had significant behavioral problems at home and

---

[30]     *See id.* at 101.

[31]     *See id.* at 102.

[32]     *See id.* at 103.

[33]     *See id.* at 104-05.

[34]     *See id.* at 106.

[35]     *See id.* at 79-87.

[36]     *See id.* at 79-80.

6

at school.[37]  On examination, Dr. Dubro indicated that MR's demeanor and

responsiveness to questions were cooperative.[38]  MR's overall ability to relate, as

well as her social skills and presentation, were all age-appropriate.[39]  MR's speech

and language were also age-appropriate and her thought processes were coherent

and goal directed.[40]  Dr. Dubro indicated that MR's mood was slightly anxious and

her affect was mildly constricted.[41]  MR's attention, concentration and memory

were all intact.[42]  Dr. Dubro reported that MR's insight and judgment were poor

and that her cognitive functioning was in the borderline range.[43]  Dr. Dubro opined

that MR could respond appropriately to changes in her environment, that she was

learning at her level of cognitive functioning, and that she was asking for

---

[37]     *See id.*

[38]     *See id.* at 80.

[39]     *See id.*

[40]     *See id.* at 80-81.

[41]     *See id.* at 81.

[42]     *See id.*

[43]     *See id.*  Dr. Dubro tested MR's intelligence and found that she was
functioning in the borderline range of intelligence.  Testing showed IQ scores of
75 (verbal), 72 (performance), and 70 (full scale).  *See id.* at 83-86.

assistance and other questions in an age-appropriate manner.[44]  Based on his

examination, Dr. Dubro found that MR's  cognitive problems were not significant

enough to interfere with the her ability to function on a daily basis.[45]  Dr. Dubro

provided the following DSM-IV[46] diagnoses: Axis I - disruptive behavior disorder

not otherwise specified ("NOS"), learning disorder NOS; Axis II - borderline

intellectual functioning; Axis III - none reported.[47]

On May 16, 2005, Dr. J. Randall, a state agency medical consultant,

reviewed the evidence of record and assessed MR's learning disability.  Dr.

Randall opined that MR's impairments did not meet, medically equal, or

functionally equal an impairment found in the Listings.[48]  Dr. Randall further

opined that MR had less than marked limitations in the functional domains of

acquiring and using information, attending and completing tasks, and interacting

---

[44]    *See id.*

[45]    *See id.* at 81-82.

[46]    DSM-IV refers to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.  2000).  Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to global assessment of functioning.

[47]    *See id.* at 82, 86.

[48]    *See id.* at 88.

and relating with others, and no limitations in the domains of moving about and manipulating objects and caring for herself.[49]

In October and November 2005, Danielle Picciano, a school psychologist, evaluated MR, who was in the first grade at that time.[50] Picciano observed that MR was friendly and talkative but that she was easily distracted and needed frequent redirection and encouragement to complete tasks.[51] MR's full scale IQ, using the WISC-IV testing model, was 94.[52] WISC-IV testing also revealed that MR's ability to sustain attention, concentration and exert mental control was in the average range.[53] MR had average cognitive ability and her WIAT-II scores were mixed for reading skills, average for math and listening comprehension, and low average for written language.[54] Picciano indicated that WIAT-II testing revealed that MR was in the average to low average academic

---

[49]     *See id.* at 90-92.

[50]     *See id.* at 156-62.

[51]     *See id.* at 156.

[52]     *See id.* at 157.  WISC-IV refers to the Wechsler Intelligence Scale for Children, Fourth Edition. *See id.* at 156.

[53]     *See id.* at 158.

[54]     *See id.* at 158-60.  WIAT-II refers to the Wechsler Individual Achievement Test, Second Edition. *See id.* at 156.

range.[55]  Picciano also reported that MR's visual motor processing skills were significantly behind for her age and her social and emotional functioning were immature.[56]

Occupational therapist William Dease evaluated MR on May 12, 2006.[57]  Dease reported that MR had deficits in various areas including attention, fine motor skills and such as grasping writing, and visual perception.[58]  Twice weekly occupational therapy was implemented on June 12, 2006.[59]

On May 25, 2006, MR's first grade teachers completed a School Information Form, provided by the South Bronx Mental Health Council, Inc., which contained three ratings – rarely, occasionally, and consistently – to describe various behaviors.[60]   On the form, MR's teachers indicated that her "school achievement level" for reading, writing, and math were "midyear 1st."[61]  In terms

---

[55]     *See id.* at 161.

[56]     *See id.*

[57]     *See id.* at 109-12.

[58]     *See id.* at 111-12.

[59]     *See id.* at 112, 114-15.

[60]     *See id.* at 73-76.

[61]     *Id.* at 73.

of behavior, the teachers noted that MR was consistently uncooperative, easily provoked, and tired in class.[62] The teachers also noted that MR bullied other children, yawned in class, did not sit still, and interrupted others. [63] The teachers noted that, when frustrated, MR consistently stopped working, showed defiance to authority and acted out.[64] MR's temperament was rarely absent-minded, whiny, unpredictable, or alienating, and she was occasionally sad, moody, impulsive or reclusive.[65] In her relationships with other children, the teachers indicated that MR rarely cried, whined, complained or avoided peers, but that she occasionally instigated fights, defended peers by fighting, and acted silly.[66] MR consistently complained about other children teasing her, and she consistently argued, made demands, and lied.[67] The teachers wrote that MR needed individual and intensive attention and counseling in and out of school. They also indicated that MR was able to learn, but her attention span and lack of concentration resulted in poor

---

[62] *See id.* at 74.

[63] *See id.*

[64] *See id.*

[65] *See id.*

[66] *See id.* at 75.

[67] *See id.*

11

academic performance.[68]  They concluded that MR was capable, smart and could

work at grade-level, but that her behavior "keeps her from reaching this goal."[69]

A January 9, 2007 letter from Cherese Demme, one of MR's second

grade teachers, notes MR's extreme inability to focus and stay on task. [70]  In her

letter, Demme notes that MR

> constantly needs to be reminded of her task and frequently
> needs one-on-one help to complete it. [MR] often distracts
> other students by getting out of her seat, calling out,
> humming, or drumming on her desk. [MR] has trouble
> listening and becomes angry when she is reprimanded. I
> have had several incidences where [MR] has become
> violent towards both teachers and other students.
> Academically [MR] is in my lowest reading group. She is
> assigned 3 out of 8 spelling words a week but usually has
> trouble with them. It is also very rare for [MR] to finish a
> writing piece.[71]

In a note dated June 20, 2006, Dr. Manuel Mosquera of the South

Bronx Mental Health Council Clinic wrote that he had been MR's psychiatrist

since May 25, 2006, when she was admitted to the clinic.[72]  Dr. Mosquera's

---

[68]   *See id.* at 76.

[69]   *Id.*

[70]   *See id.* at 137.

[71]   *See id.* at 137-38.

[72]   *See id.* at 77.

diagnosis was disruptive behavior not otherwise specified, conduct disorder, but that two conditions, ADHD and oppositional defiant disorder ("ODD"), were to be ruled out.[73] Dr. Mosquera prescribed Concerta for MR.[74]

A Department of Education Individualized Education Program ("IEP") from June 2006, recommended that MR be placed in a "collaborative team teaching" setting with related services, including occupational therapy.[75] Based on observation and teacher reports, MR's social and emotional functioning were deemed immature for her age.[76] She had difficulty following rules and was easily distracted and oppositional at times.[77] It was noted that MR worked better on a one-on-one basis and often sought attention from teachers and peers.[78] The IEP noted that MR's behavior, which could be addressed by general education, did not

---

[73]   *See id.* A rule out diagnosis means a diagnosis which is possible but not yet established. *See Law v. Barnhart*, 439 F. Supp. 2d 296, 307 (S.D.N.Y. 2006).

[74]   *See* Tr. at 77.

[75]   *Id.* at 114-15, 125, 127.

[76]   *See id.* at 117.

[77]   *See id.*

[78]   *See id.*

13

seriously interfere with her instruction.[79]  MR was in good health and had no

health care or physical needs.[80]  Although general education was considered, MR

was placed in a special class because she needed additional academic and

behavioral support.[81]

        In April 2007, approximately three months after the administrative

hearing was held, MR was examined by Dr. Joseph Andrews, a consulting

psychologist.[82]  On examination, Dr. Andrews found that MR  presented herself in

an age-appropriate manner and was cooperative.[83]  Dr. Andrews observed that

MR's behavior was marked by a high degree of restlessness and hyperactivity.[84]

MR's speech and language were age-appropriate, and her thought processes were

logical and coherent.[85]  MR's affect was full and her mood was euthymic.[86]  Dr.

---

[79]    *See id.*

[80]    *See id.* at 118-19.

[81]    *See id.*

[82]    *See id.* at 171-80.

[83]    *See id.* at 173.

[84]    *See id.*

[85]    *See id.*

[86]    *See id.* A "euthymic" mood means that an individual's mood is in the normal range, neither depressed nor elevated. *See* DSM-IV at 825.

Andrews found that MR's attention and concentration were mildly impaired, but that her memory was intact.[87]  Dr. Andrews also reported that MR's insight and judgment were poor.[88]

Dr. Andrews opined that MR was able to follow and understand age-appropriate directions, but that she had difficulty completing age-appropriate tasks and maintaining appropriate social behavior.[89]  Although Dr. Andrews believed MR could respond appropriately to changes in her environment, she had difficulty interacting adequately with both peers and adults.[90]  Dr. Andrews' diagnoses were ADHD and ODD and rule out learning disorder and mixed receptive  expressive language disorder.[91]  Dr. Andrews tested MR's intellectual functioning and found it to be below average.[92]  However, he believed that these results underestimated her cognitive ability because of her high degree of

---

[87]     *See* Tr. at 173.

[88]     *See id.* at 174.

[89]     *See id.*

[90]     *See id.*

[91]     *See id.* at 174-75.

[92]     Using the WISC-IV testing system, MR's full scale IQ was 52.  *See id.* at 178-79.

carelessness, impulsivity and hyperactivity.[93]   Dr. Andrews also believed that

MR's test results were not a valid measure of her cognition because she passed

more difficult test items and failed easier ones.[94]

On May 23, 2007, Dr. Robert Berk, a non-examining medical review

physician, completed a questionnaire regarding MR.[95]   Dr. Berk indicated that the

medical evidence showed that MR had a learning disorder and ADHD.[96]   Dr. Berk

opined that MR had no limitations in the functional domains of moving about and

manipulating objects and health and physical well-being, and less than marked

limitations in the remaining functional domains.[97]

## II.   LEGAL STANDARD

To be found disabled, a child must not be working; she must have a

medically determinable impairment that is severe; and her impairment must meet

or equal – medically or functionally – an impairment listed in the Listings.[98]   An

---

[93]   *See id.* at 178.

[94]   *See id.* at 179.

[95]   *See id.* at 181-83.

[96]   *See id.* at 181.

[97]   *See id.* at 182.

[98]   *See* 20 C.F.R. § 416.924(a).

16

impairment will be found to functionally equal a listed impairment if it results in either a marked impairment in two domains or an extreme impairment in one domain.[99] The six domains are as follows: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being.[100]

A child has a "marked" limitation in a domain when the impairment interferes seriously with her ability to independently initiate, sustain, or complete activities.[101] A child has an "extreme" limitation in a domain when the impairment interferes very seriously with her ability to independently initiate, sustain, or complete activities.[102]

## III. DISCUSSION

### A. Remand to Further Develop the Record Is Appropriate

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), a court has the "power to enter, upon the pleadings and transcript of the record, a judgment

---

[99] *See id.* § 416.926a(d).

[100] *See id.* § 416.926a(g)-(l).

[101] *See id.* § 416.926a(e)(2).

[102] *See id.* § 416.926a(e)(3).

affirming, modifying, or reversing the decision of the Commissioner, with or

without remanding the cause for a rehearing."[103]  Remand is appropriate in cases

where the Commissioner has failed to provide a full and fair hearing, to make

explicit findings, or to have correctly applied the law and regulations.[104]  It is

well-established that an ALJ has an obligation to develop the record whether or

not the claimant is represented by counsel.[105]  This obligation is heightened when

the claimant is not represented or has difficulty communicating in English.[106]

Here, the Commissioner concedes that the ALJ erred in this case by not fully

developing the record.[107]  Although the ALJ noted that MR had received mental

heath treatment from South Bronx Mental Health Services, he did not attempt to

obtain any records from this source.  As a result, it is unclear whether the

---

[103]     42 U.S.C. § 405(g).

[104]     *See Melkonyan v. Sullivan*, 501 U.S. 89, 101 (1991) (discussing
legislative history and different types of remands available in social security
cases); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

[105]     *See Rosa*, 168 F.3d at 79.

[106]     *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("The ALJ has a
duty to adequately protect a pro se claimant's rights 'by ensuring that all of the
relevant facts [are] sufficiently developed and considered.'") (quoting *Hankerson
v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)).

[107]     *See* Memorandum of Law in Opposition to Plaintiff's Motion for
Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion
for Remand for Administration Proceedings at 13.

medication initially prescribed for MR (Concerta) was continued, whether that medication was effective, and whether MR received any additional care in connection with her mental conditions.  Moreover, there are no medical records from this treating source which reflect MR's functioning or the steps that were taken to address the child's impairments.

As the Second Circuit has stated, "'[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.'"[108]  Here, there are gaps in the administrative record because the ALJ failed to fully develop it.  Accordingly, this Court will grant the Commissioner's request to vacate the ALJ's decision and remand the case in order to more fully develop the record.

### B.    Reversal for the Calculation of Benefits Is Not Appropriate

Despite the lack of treating source evidence supporting her claim, plaintiff argues that the existing record, which consists primarily of anecdotal evidence from non-medical sources, provides persuasive proof of MR's disability. A court should order payment of benefits only in those rare instances where the

---

[108]     *Rosa*, 168 F.3d at 82-83 (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (brackets in original)).

19

record contains "persuasive proof of disability" and remand for further evidentiary proceedings would serve no further purpose.[109]   In this case, the medical evidence in support of MR's claim is scant and the record is lacking sufficient treating physician evidence.  Because the record does not compel the conclusion that MR is disabled, the Commissioner's decision must be vacated and the case remanded for further administrative proceedings.  A remand solely for the calculation of benefits is not appropriate.

## IV.   CONCLUSION

For the foregoing reasons, the decision of the ALJ is hereby vacated and the case is remanded for further administrative proceedings consistent with this Opinion.  The Clerk of the Court is directed to close the outstanding motions (Documents # 10 & 11) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 9, 2009

---

[109]      *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998); *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)(remand for calculation of benefits only appropriate where a remand for further development of the record would serve no purpose).

## - Appearances -

**For Plaintiff:**

James M. Baker, Esq.
Center for Disability Advocacy Rights
100 Lafayette Street, 3rd Floor
New York, NY 10013
(212) 979-0505

**For Defendant:**

John E. Gura, Jr.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2712